**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

| | |
|---|---|
| **Love, et al.,** | On Appeal from the United States District Court for the District of Colorado |
| Plaintiffs-Appellees, | |
| v. | The Honorable Raymond P. Moore District Judge |
| **Grashorn,** | |
| Defendant-Appellant. | District of Colorado No. 21-cv-02502-RM-KLM |

**RESPONSE BRIEF OF PLAINTIFF-APPELLEES**

THE LIFE & LIBERTY LAW OFFICE

Sarah Schielke
Madison Waldrep, *Student Attorney*
1055 Cleveland Avenue
Loveland, CO 80537
(970) 493-1980
sarah@lifeandlibertylaw.com
madison@lifeandlibertylaw.com
*Counsel for Plaintiff-Appellees*

Oral argument is not requested.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………......………………iii

STATEMENT OF RELATED CASES ……………………………………….v

I. INTRODUCTION………………………………………………………….vi

II. STATEMENT OF JURISDICTION……………………………………….1

III. STATEMENT OF THE ISSUES ………………………………………….2

IV. STATEMENT OF THE CASE……………………………………………3

V. STANDARD OF REVIEW ………………………………………………14

VI. SUMMARY OF THE ARGUMENT……………………………………..15

VII. ARGUMENT ………………………………………………………..17

    A. This Court does not have jurisdiction to conduct interlocutory appellate review of the District Court's ruling………………………………….17

    B. The law was clearly established: Citizens' pets are subject to Fourth Amendment protection, and an officer's warrantless killing (seizure) of them must be reasonable…………………………………………………20

    C. It is not reasonable as a matter of law for an officer to immediately kill any unleashed friendly dog he encounters so that he may eliminate all risk of a dog bite ………………………………………………...…….....22

VIII. CONCLUSION……………………………………………...……..27

IX. STATEMENT REGARDING ORAL ARGUMENT ………………….…28

CERTIFICATE OF COMPLIANCE……………………………………...29

CERTIFICATE OF SERVICE …………………………………………....30

# TABLE OF AUTHORITIES

## Cases

*Altman v. City of High Point, N.C.*,
　330 F.3d 194 (4th Cir. 2003) ……………………………………22, 19

*Anderson v. Liberty Lobby Inc.*,
　477 U.S. 242 (1986) ……………………………………………24

*Andrews v. City of W. Branch*,
　454 F.3d 914 (8th Cir. 2006)…………………………………….13, 23

*Bewley v. City of Duncan*,
　Nos. 97-6274, 97-6321, 1998 WL 314382 (10th Cir. June 4, 1998)………17

*Branson v. Price*,
　2015 WL 5562174 (D. Colo. Sept 21, 2015)………………13, 14, 15, 20, 22

*Brown v. Muhlenberg Tp.*,
　269 F.3d 205 (3rd Cir. 2001) …………………………………….19, 23

*Casey v. City of Federal Heights*,
　509 F.3d 1278 (10th Cir. 2007) …………………………………….16

*Estate of Smart v. Cty. of Wichita*,
　No. 14-2111-JPO, 2018 WL 3744063 (D. Kan. Aug. 7, 2018) …...………22

*Fogarty v. Gallegos*,
　523 F.3d 1147 (10th Cir. 2008) …………………………….…..15, 18, 19

*Graham v. Connor*,
　490 U.S. 386 (1989) …………………………………………….13

*Henderson v. Glanz*,
　813 F.3d 938 (10th Cir. 2015) ………………………………….…..18

*Irizarry v. Yehia*,
　38 F.4th 1282 (10th Cir. 2022) …………………………………….19

*Johnson v. Jones,*
    515 U.S. 304 (1995) ……………………………………………..18

*Knopf v. Williams,*
    884 F.3d 939 (10th Cir. 2018) ……………………………………..15

*Lewis v. Tripp,*
    604 F.3d 1221 (10th Cir. 2010)……………………………………18

*Manzanares v. Roosevelt Cnty. Adult Det. Ctr.,*
    331 F.Supp. 3d 1260 (D.N.M. 2018)……………………………………22

*Maldonado v. Fontanes,*
    568 F.3d 263 (1st Cir. 2009)………………………………………19

*Mayfield v. Bethards,*
    826 F.3d 1252 (10th Cir. 2016) ……………………………13, 17, 19, 20, 21

*Mick v. Brewer,*
    76 F.3d 1127(10th Cir. 1996)………………………………………15

*Ralston v. Cannon,*
    884 F.3d 1060 (10th Cir. 2018) ……………………………………18

*Roosevelt-Hennix v. Prickett,*
    717 F.3d 751 (10th Cir. 2013) ……………………………………..19

*San Jose Charter of Hells Angels v. City of San Jose,*
    402 F.3d 962 (9th Cir. 2005) …………………..………………………23

*Sevier v. City of Lawrence,*
    60 F.3d 695 (10th Cir. 1995) ……………………………………..…26

*Skinner v. Ard,*
    517 F.Supp.3d 586 (M.D. La. (2021) ……………………………..…..17

*U.S. v. Place,*
    462 U.S. 696 (1983) ……………………………………………22

*Viilo v. Eyre,*
    547 F.3d 707 (7th Cir. 2008) ……………………………………22

*Wilson v. Layne,*
    526 U.S. 603, 615 (1999) …………………………………………………15

*Wise v. Caffey,*
    72 F.4th 1199 (10th Cir. 2023) …………………………………………14, 18

**Rules**

Fed. R. Civ. P. 56 (a) …………………………………………………...…14, 24

Fed. R. App. P. 34(a)(2)……………………………………………………..26


**Other Authorities**

U.S. Const. amend. IV …………………………………………………20, 21

C.R.S. § 29-5-112……………………………………………………..……5

## STATEMENT OF RELATED CASES

There are no prior or related cases or appeals.

# I.  <u>INTRODUCTION</u>

In the late afternoon of June 29, 2019, Officer Mat Grashorn of the Loveland Police Department quietly crept up behind Plaintiffs as they repaired an ice box next to their truck in an empty suburban business parking lot. Their 14-month-old dog Herkimer, who had been resting inside their truck, noticed Grashorn. He hopped out of the truck and trotted over to greet him with his tail awag. In response, Grashorn pulled out his gun, closed the distance by continuing to advance, and promptly shot two bullets through Plaintiffs' beloved pet. He put one in the middle of Herkimer's eyes, and through his skull. The other was shot through both sides of Herkimer's chest. Herkimer's injuries were not survivable. He had to be euthanized.

Prior to being shot, Herkimer had not growled at Grashorn. He had not barked. He had not bit him or anyone else. He had not raised his hackles. He had displayed no signs of aggression. With his big ears up and facing forward, all Herkimer had done that day prior to being summarily executed was trot toward Grashorn with wagging tail, a friendly, curious demeanor, without a leash on. Since the literal minute after he shot Herkimer, Grashorn has insisted that this (being unleashed), on its own and as a matter of law, was enough to justify the dog's killing. All dogs can bite, even friendly ones, and Grashorn was "not gonna wait to find out." He "didn't

take the chances" as he was "not in the business to get bit." He has relentlessly pressed this argument through the entirety of this case's litigation.[1]

The incident was recorded on bodyworn camera video and garnered statewide and national media attention.[2] The District Court here, after reviewing that video, denied Grashorn's Motion for Summary Judgment, stating: "there are genuine issues of material fact concerning whether Defendant's actions were reasonable." Aplt. Appx. Vol. VI, at 1065. In support, the District Court detailed several of those issues of material fact. Id. at 1065-66. None of the District Court's Order was premised on unique resolution of an abstract issue of law. Grashorn filed this interlocutory appeal anyway. This Court recognized the jurisdictional problem immediately and Ordered the parties to specifically address the issue in their briefs. *Order*, Case 23-1397, Doc. No. 010110977095 (January 2, 2024). Seemingly still "not in the business to get bit," Grashorn did not bother.

---

[1] From Grashorn's own Statement of Undisputed Material Facts provided in support of his Motion for Summary Judgment: "[I]t is undisputed that Officer Grashorn was not going to risk Herkimer biting Officer Grashorn's leg." Aplt. App. 1051, No. 132.

[2] Andrea Salcedo, *Body-cam footage shows police shoot a 'playful' puppy: 'He was curious and excited to greet this officer.'* The Washington Post (Aug 27, 2021 at 6:27AM), https://www.washingtonpost.com/nation/2021/08/27/colorado-lawsuit-officer-shot-puppy/. *See also Order Denying Motion to Stay Discovery* [ECF 83], 21-cv-02502-RM-NRN, ECF 83, p. 14 (May 24, 2022) ("The Court takes judicial notice of the fact this incident has received state-wide and even national attention. The public has a strong interest in understanding what occurred on June 29, 2021, and whether the shooting death of an allegedly friendly dog, who was showing no signs of aggression, was lawful.").

# I. STATEMENT OF JURISDICTION

Plaintiff-Appellees Wendy Love and Jay Hamm agree with Defendant-Appellant Officer Mathew Grashorn that this Court only has jurisdiction to review orders denying qualified immunity before trial when their appeal concerns exclusively neat, abstract issues of law. Op. Br. at 8. This is a narrow exception strictly enforced by this Court, *Order*, Case 23-1397, Doc. No. 010110977095 (January 2, 2024) ("Accordingly, the court directs the parties to address with specificity in their briefs whether this court has jurisdiction to review the district court's order denying qualified immunity."), and yet here Grashorn has identified no legal rulings which could fit that limited bill. This interlocutory appeal should thus be dismissed for want of jurisdiction. *See* § VII Argmt. A, *infra*.

## II. STATEMENT OF THE ISSUES

As this appeal must be limited to abstract issues of law, the issues are necessarily as follows:

1) The District Court denied qualified immunity because there exist numerous material facts in evidence from which a reasonable jury could conclude Grashorn's killing of Plaintiff's pet dog Herkimer was unreasonable. Does this Court have subject matter jurisdiction to review that type of ruling on interlocutory appeal?

2) Was the law clearly established in the Tenth Circuit on June 29, 2019 as to pet dogs being effects subject to Fourth Amendment protection, the warrantless seizure of which must be reasonable?

3) Is it *reasonable as a matter of law* for an officer to immediately kill any unleashed friendly dog he encounters in order to eliminate all chance (no matter how remote) of a dog bite?

# III. STATEMENT OF THE CASE

### *Statement of Facts*

Just before 5 p.m. on June 29, 2019, Plaintiff-Appellees and spouses Jay Hamm and Wendy Love were working for their firewood delivery business, preparing to make their last delivery of the day. Aplt. App. Vol. VI at 1028, No. 84. Their previous client had just given them an old ice box to use for their next customer (Namaqua Liquor in Loveland) to keep the delivered wood in, the box needed a quick paint repair first. Id. at 1028, No. 85. Plaintiffs lived in Berthoud, so their home was not nearby. Id. at 1029, No. 86. While on their way to that final customer of the day, they looked for somewhere to stop, and saw an apparently vacant business surrounded by a large, empty parking lot that abutted a large neighborhood of residential homes. Id. at 1029, No. 87. Mr. Hamm drove to the furthest back corner and parked in a nice, peaceful spot with some shade. Id. They were visible from the road, but there were no people or cars anywhere nearby who might be bothered. Id. at 1030, No. 88. They laid out a tarp on the pavement (to protect it from paint) and then together placed the large icebox onto the tarp to paint its damaged corner.

As always, Mr. Hamm and Ms. Love had their three beloved dogs with them that day. Bubba, a 16-year-old Rhodesian Ridgeback, Max, a black lab mix, and Herkimer, a 14-month-old Staffordshire Terrier/Boxer mix. It was a hot day. Ms. Love first let Herkimer out of the truck to stretch, drink some water, and play. Id. at

1031, No. 89. He did that for about five minutes and then jumped back into the truck to settle in his favorite spot in the backseat. Id. Ms. Love then let Bubba out of the truck where he drank some water and then laid down to rest on the parking lot pavement in the sun, a few yards away from where Mr. Hamm worked on the icebox. Id. at 1031, No. 90.

Unbeknownst to Mr. Hamm and Ms. Love, the owner of this otherwise vacant business was remotely watching surveillance video of the parking lot from his home in Fort Collins. He had seen Plaintiffs' truck park back in the corner, and he had previously had issues with people using his dumpster. He called Loveland PD dispatch, and told them the following:

- There was a truck parked in the back corner of the business parking lot.

- It looked like they might be "unpacking things."

- "We have had a couple people come by and use our dumpster, and I just don't want to have any more of that going on."

- Since they appeared to be unpacking things, he worried they might be "planning on" trying to use his dumpster

Id. at 982-984, No. 4-9. Mr. Hendrickson asked for police to respond to ensure that the people in the lot did not use his dumpster. Id. at 984, No. 9. Dispatched relayed

this information to Officers Grashorn and Nye and sent them to fulfill Mr. Hendrickson's request. Id. at 1032, No. 91.

Officer Grashorn arrived first. He saw that Ms. Love and Mr. Hamm continued to be nowhere near the business building or dumpster. Id. at 1036, No. 80. He also saw Bubba sleeping unsecured on the parking lot pavement. Id. at 1032, No. 92. If his intent had been to actually oblige Mr. Hendrickson's simple request, he could have driven up to Ms. Love and Mr. Hamm and told them that the business owner did not want them using his dumpster. But his intent was not to oblige Mr. Hendrickson's request. His intent was to sneak up on the Plaintiffs, in the hope of catching them engaged in some kind of drug use or criminal activity. Id. at 1033, No. 93.

So, despite seeing their large, unsecured dog Bubba sleeping on the pavement, Grashorn decided to ignore both Colorado law and police training governing how officers must approach unsecured pet dogs[3] and instead would try to quietly surprise Ms. Love and Mr. Hamm from behind. Id. at 1033, No. 93-94. He parked over 30

---

[3] Colorado law, codified in C.R.S. § 29-5-112 and known as the "Dog Protection Act," "[r]equire[s] local law enforcement agencies in the state to adopt policies and procedures for use of lethal and nonlethal force against dogs, which policies and procedures must: . . . Allow a dog owner or animal control officer, whenever the owner or an animal control officer is present and it is feasible, the opportunity to control or remove a dog from the immediate area in order to permit a local law enforcement officer to discharge his or her duties." C.R.S. § 29-5-112(2)(b)(II) (2024). Grashorn received such training. Aplt. App. Vol III, at 414.

yards away from them in the lot. Id. at 1033, No. 95. He did not activate his red and blue lights or siren. Id. He did not wait for his partner officer to arrive before approaching. Id. He opened his car door as quietly as possible and attempted to also shut the door as slowly and quietly as possible. Id. at 1033, No. 94. The sound of the door nevertheless got Bubba's attention. Bubba sat up, noticed Grashorn, and like all friendly dogs tend to do, he began getting up (rather slowly, as he was quite old) to go greet him. Id. at 1034, No. 96.

At the moment that Bubba stood up, Grashorn was still right next to his patrol car. Aplt. Appx. Vol. VI at 997, No. 29. If truly afraid of Bubba, he could have just gotten back inside it. Id. at 1035, No. 99. If truly afraid of Bubba, he also could have pulled out his baton, pulled out his taser, or pulled out OC spray to be ready just in case. Id. at 98. He also could have just done what every reasonable officer would have done: evaluate Bubba's demeanor to be that of a friendly dog (on account of the fact that thus far all Bubba had done was behave like a friendly dog), and done nothing. Id. But instead, Grashorn immediately pulled out his firearm, pointed it at Bubba, and prepared to execute him. Id. at 1020, No. 70. Bubba was still over 30 yards away from Grashorn when he did this. Id. And, as Grashorn did it, he actually stepped *away* from the refuge of his patrol car and *towards* the pet dog he was pointing his gun at. Id. at 1036, No. 100. He yelled something at Bubba. This got the attention of Ms. Love and Mr. Hamm, who up until that moment had their backs to

Grashorn. Naturally quite startled by the sudden appearance of a police officer who was now pointing a gun at their elderly dog they saw was trotting over to greet him, they both immediately called out to Bubba to come back to them. Bubba promptly did so. Id. at 1036, No. 101.

But this brief verbal commotion caused young Herkimer, who had been resting in the truck, to jump out the truck's open door to see what was going on. Id. at 1036, No. 102. Herkimer first trotted over to Bubba (who was now headed back towards Plaintiffs) to playfully bop him with his nose. Id. at 1037, No. 103. Herkimer then noticed Officer Grashorn, who had continued his approach (now about 15-20 yards away) and who, incomprehensibly, still had his gun out pointed at everyone. Id. Oblivious to the firearm, Herkimer happily bounded over to greet Grashorn next. Id. at 1037, No. 104. Everything about Herkimer's demeanor was consistent with puppy curiosity and friendly interest.[4] Id. at 1038, No. 105. He did not growl. He had no hackles up. His ears were not back. He was not showing his teeth. His tail was wagging. Id. at 1039, No. 107. Mr. Hamm and Ms. Love yelled for Herkimer to come back. Herkimer began to oblige their call. Id at 1040, No. 109. He slowed and

---

[4] Dr. Crosby, a police practices and canine behavior expert, characterized Herkimer's gait as "literally bounding up and down, which is extremely common in affiliative, positively-oriented dogs that are soliciting contact and play." Aplt. App. 999, No. 34.

began to peeling off to the right in a C-shape motion. Id. at 1040, No. 110. At this moment, this is what Herkimer looked like:



As the photo above (and the video) reveal, no reasonable officer or reasonable person would have perceived Herkimer as a threat requiring *any* kind of violent response, let alone as a threat that required his immediate execution. But Grashorn didn't care. He already had his gun out and he was now eager to shoot something. Id. at 1042, No. 114. He had also just made a number of after-market modifications to his duty firearm (including adding a laser sight and an extended magazine) that he was ready to test out in the field. Id.

He was also a little bit embarrassed. Grashorn would have to complete a bunch of paperwork now that he had pulled out his gun and pointed it at these people. And the more of Herkimer's plainly friendly disposition he allowed to be captured on his video, the more foolish he was going to look when he turned in to chain of command his explanation. "A friendly dog came towards me on a petty trespass call so I immediately prepared to kill it" does not have the sanest ring to it. And so, on this sunny, peaceful day in a quiet Loveland neighborhood in June, Grashorn opened fire on Herkimer. He first shot him through the head, and then, also for no good reason at all, he shot him again, through his chest. Id. at 1043, No. 115.

Herkimer's body immediately collapsed, stiff and paralyzed, his previously happy eyes now wide open in pain and distress. Ms. Love began sobbing in horror. She begged to go to her puppy to comfort him. Ex. B 0:00:39-0:00:47 ("He's a puppy! Can I see him please? Please let me see him. Please. Oh my god. Let me see him."). But Grashorn continued on with his unreasonable and warrantless seizure, next pointing his gun at Ms. Love and ordering her to "get back to the truck!" Id. at 1043, No. 116. Through agonized sobs, she pleaded with Grashorn for over a minute to allow her to go comfort her dying dog, while Herkimer could be seen trying to move helplessly in the direction of her voice. Grashorn refused her request. Id. at 1044, No. 117. He says he did this because he just assumed Herkimer would "die any second." Id. at 1044, No. 118.

Meanwhile, Mr. Hamm, still by his truck, demanded to know why Grashorn had just shot their clearly friendly dog. Grashorn snapped at Mr. Hamm that he had "no way of knowing" whether a dog is friendly and that, in any event, he wasn't going to "wait to find out." Id. at 1045, No. 119. Mr. Hamm, horrified, asked Grashorn why he wouldn't have first used any of the multitude of non-lethal force options he had available before resorting to lethal gunfire. Grashorn told him that he "don't take the chances" with non-lethal alternatives, that "they don't always work," and he "has to do what's gonna work." Id. at 1046, No. 121.

At his deposition, Officer Grashorn also testified to the following facts:

- He observed Bubba, "a large tan dog," laying on the pavement unsecured while he was still inside his own patrol vehicle. Id. at 1032, No. 92.

- He knew that Colorado's Dog Protection Act and Loveland PD Policy directed that he give Bubba's owners an opportunity to secure Bubba before resorting to any use of force on the dog, but that he didn't feel like doing that here because it "would give people an opportunity to get away with stuff." Id.

- He was unwilling to return to his vehicle or consider any non-lethal alternatives to shooting Herkimer because he thought it was more important to first "identify the suspects at hand" and he hadn't "yet establish[ed] what, if any crime, was being committed." Id. at 1046, No. 122.

- When Plaintiffs called out for Bubba, Grashorn witnessed Bubba return to them immediately, and when Plaintiffs called for Herkimer, Grashorn witnessed in the one second after that that Herkimer appeared to be slowing his gait and turning to the left. Id. at 1047, No. 123.

- The sum total list of things Grashorn observed Herkimer do that he personally considered to be "aggressive" prior to shooting him were (1) "running towards him," (2) that he had not instantly stopped in his tracks in response to Grashorn having yelled "stop" at the dog one time, and (3) Herkimer had "look[ed] at his leg."[5] Id. at 1048, No. 125.

- Grashorn admitted that he gave Herkimer less than one second to react to him yelling "Stop" once before he shot him. Id. at 1048, No. 125.

- Grashorn agreed that friendly dogs with no intention of biting can also commonly run towards a person to greet them, not come to an instant stop in under one second following a command, and look at a person's leg, including his own dog. Id. at 1053-54, No. 137-38.

---

[5] Grashorn's BWC video also reveals the claim of Herkimer "looking at his leg" to be demonstrably false. Ex. B at 0:00:20-29. Herkimer's gaze was at all times looking curiously upwards at Grashorn's face all the way up until the moment he was fatally shot. Id.

- Grashorn testified that he was trained that "indications of a dog exhibiting aggressive behavior" are: "growling, showing teeth, hair on the back raised, lunging at you." Id. at 1047, No. 124.

- Grashorn agreed that Herkimer demonstrated none of these indicators. Id.

- Grashorn admitted that he had "never tried" tasing a dog and had no recollection of any training or experience suggesting that it was ineffective. Id. at 1049, No. 128.

Grashorn then refused to let Mr. Hamm and Ms. Love take Herkimer to their vet, who was just around the corner. He told them, inexplicably, they would have to wait for his sergeant to arrive first. Ex. B. 0:00:31 – 0:08:31. Herkimer's injuries were not survivable. Four days later, he was euthanized.

### *The Order Denying Qualified Immunity*

In June 2021, Ms. Love and Mr. Hamm filed a lawsuit against Officer Grashorn pursuant to 42 U.S.C. § 1983, alleging that Grashorn's execution of their pet dog Herkimer was an unreasonable seizure that violated the Fourth Amendment. At the close of discovery in March 2023, Grashorn filed a Motion for Summary Judgment on the basis of qualified immunity. Grashorn's motion was properly denied by the District Court in November 2023. In its Order denying summary

judgment (Aplt. Appx. Vol. VI, 1060-70), the District Court first cited the applicable

law:

> It is clearly established in this Circuit that a police officer's shooting
> of a pet dog is a "seizure" under the Fourth Amendment. *Mayfield v.
> Bethards*, 826 F.3d 1252, 1258-59 (10th Cir. 2016). Whether the
> seizure here violated Plaintiffs' constitutional rights depends on
> whether it was reasonable under the circumstances. *See Andrews v.
> City of W. Branch*, 454 F.3d 914, 918 (8th Cir. 2006); *see also Branson
> v. Price*, No. 13-cv-03090-REB-NYW, 2015 WL 5562174, at *7 (D.
> Colo. Sept. 21, 2015) (unpublished) ("[T]he robust consensus of
> persuasive authority from other courts of appeal demonstrates that the
> defendant had fair notice, even in this novel factual circumstance, that
> using deadly force against a dog was unlawful when the dog did not
> present an imminent threat to law enforcement or the public."). "The
> 'reasonableness' of a particular use of force must be judged from the
> perspective of a reasonable officer; it does not turn on the subjective
> intent of the officer." *Andrews*, 454 F.3d at 918 (citing *Graham v.
> Connor*, 490 U.S. 386, 396-97 (1989)). To defeat Defendant's claim
> of qualified immunity, Plaintiffs must show that a reasonable officer
> with the information Defendant had at the time of the shooting would
> not have believed his conduct was lawful under clearly established
> law.

Aplt. Appx. Vol. VI, 1065 (*Order Denying Motion for Summary Judgment*, p. 5-6).

Then it proceeded to review the totality of circumstances in this case, listing various

material fact determinations a reasonable jury could find in Plaintiffs' favor (the dog

was not at-large, the owners were available and willing to assert control, non-lethal

means existed to control the dog, the dog did not pose a danger to the officer or the

public) to reach the conclusion that the seizure was unreasonable. Id. The Court

recognized the heavy weight of one particular factor in this case: namely, that a

reasonable jury "could decide that [Herkimer] did not pose an immediate danger" to anyone. Id. at 1066 ("The Court finds that the fifth factor is the most critical in assessing the reasonableness of Defendant's conduct here. 'Incidents involving a dog that has not actually attacked a person are closer cases and can demonstrate that the deadly force was unreasonable.' *Branson*, 2015 WL 5562174, at *5 (quotation omitted)."). The Court noted it had viewed all the evidence "including the video footage" in the light most favorable to the Plaintiffs, and concluded that "a reasonable jury could conclude that Defendant's conduct was unreasonable, and therefore . . . he is not entitled to qualified immunity." Aplt. Appx. Vol. VI at 1066.

## IV. STANDARD OF REVIEW

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard requires "viewing the evidence in the light most favorable to the nonmoving party." *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023) (internal quotation marks omitted). "In qualified immunity cases, this usually means adopting … the plaintiff's version of the facts." *Id.* (alteration in original) (internal quotation marks omitted). This Court is "not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for the jury to decide, or that a plaintiff's evidence is

sufficient to support a particular factual inference." *Fogarty v. Gallegos*, 532 F.3d 1147, 1154 (10th Cir. 2008).

In cases in which a defendant is claiming qualified immunity as a defense, the plaintiff must prove "(1) that the [defendant] official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Branson v. Price,* 2015 WL 5562174, at *1 (D. Colo. Sept 21, 2015). The relevant, dispositive inquiry as to whether a right was clearly established at the time of the incident is whether it would be clear to a reasonable officer that his conduct was unlawful. *Wilson v. Layne*, 526 U.S. 603, 615 (1999). A plaintiff need not cite a case directly on point – they must instead show that the law would have informed a reasonable officer in the defendant's position that his conduct was unlawful. *See Knopf v. Williams*, 884 F.3d 939, 949 (10th Cir. 2018).

When plaintiffs satisfy their burden of meeting both prongs, an officer-defendant can only "preserve his or her entitlement to qualified immunity by showing 'that there are no disputes of material fact as to whether his conduct was objectively reasonable in light of clearly established law and the information known to [him] at the time.'" *Branson*, 2015 WL 5562174, at *2, quoting *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior

case law to clearly establish the violation." *Casey v. City of Federal Heights,* 509 F.3d 1278, 1284 (10th Cir. 2007).

## V. SUMMARY OF ARGUMENT

This Court should affirm the District Court's denial of summary judgment for Officer Grashorn. In its Order denying summary judgment on qualified immunity grounds (Aplt. App. Vol. VI, 1060-70), the District Court properly found that the law was clearly established at the time Officer Grashorn shot Herkimer, putting him on notice that such conduct was a warrantless seizure under the Fourth Amendment that would need to be reasonable in order to be lawful. The District Court's Order then properly discussed the various material facts a reasonable jury could resolve in Plaintiffs' favor to reach the conclusion that Grashorn's seizure was unreasonable. The District Court also noted that genuine issues of material fact remained, also upon which a reasonable jury could conclude that Officer Grashorn's conduct was unreasonable. Id. at 1065-66. The District Court's analysis here was straightforward and appropriate. None of its findings were erroneous as a matter of law. None of its rulings involved any unique issues of abstract law. This court thus lacks jurisdiction to review the substance of the District Court's Order.

There are two pure issues of law contained in the District Court's ruling that are not bound up with the resolution of disputed issues of material fact. Both can be disposed of rather quickly. They are:

(1) Was the law clearly established in the Tenth Circuit on 6/29/19 as to pet dogs being effects subject to Fourth Amendment protection, the warrantless seizure of which must be reasonable?

Since *Mayfield v. Bethards* in 2016 (and arguably, according to the *Mayfield* court, since *Bewley v. City of Duncan*, 1998 WL 314382 (unpublished) (10th Cir. June 4, 1998)), the answer to this question has been "yes." And:

(2) Is it *reasonable as a matter of law* for an officer to twice shoot[6] any unleashed friendly dog he happens to encounter in order to eliminate all chance (no matter how small) of a dog bite?

It is not.

## VI. ARGUMENT

### A. This Court does not have jurisdiction to conduct interlocutory appellate review of the District Court's ruling denying qualified immunity.

The Tenth Circuit "has jurisdiction over appeals challenging the denial of a qualified immunity-based motion for summary judgment **only if a defendant-**

---

[6] It bears reminding that even if a reasonable jury resolved nearly every disputed material fact in Grashorn's favor in this case, that jury could still find the seizure unreasonable solely on account of the second bullet Grashorn fired. Grashorn testified that he shot Herkimer twice because he "did not want to find out if one bullet was effective of preventing me from getting bit." Aplt. App. Vol. II, 429 (*Grashorn Deposition Transcript*, 124:1-12). *Compare Skinner v. Ard*, 517 F.Supp.3d 586, 589-90 (M.D. La. 2021) ("The court finds that every reasonable officer would know that it was unlawful to fire a final shot and execute a wounded animal that posed no threat.").

**appellant does not dispute the facts a reasonable juror could find**, but, instead, 'raises only legal challenges to the denial of qualified immunity based on those facts.'" *Ralston v. Cannon*, 884 F.3d 1060, 1067 (10th Cir. 2018) (emphasis added) (quoting *Henderson v. Glanz*, 813 F.3d 938, 947-948 (10th Cir. 2015)). The Court is "not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for the jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fogarty v. Gallegos*, 532 F.3d 1147, 1154 (10th Cir. 2008). "[I]f a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, . . . we usually must take them as true – and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (citations omitted).

This limited appellate jurisdiction flows from the U.S. Supreme Court's decision in *Johnson v. Jones*, 515 U.S. 304, 313 (1995). There, the Court held that a "question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial . . . is not appealable." *Id.* Under this limited jurisdiction, "[t]hose facts explicitly found by the district court, combined with those that it likely assumed, [] form the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." *Fogarty*, 523 F.3d at 1154. Upon those facts, this Court's interlocutory appellate jurisdiction extends only to

"abstract issues of law." *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023). Specifically, the Court has jurisdiction to review: (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Id.* (citations omitted).

Officer Grashorn's appeal is rooted in genuine issues of material fact and evidentiary sufficiency that are not reviewable on interlocutory appeal. *See, e.g., Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 752 (10th Cir. 2013); *Fogarty*, 523 F.3d at 1154. Seemingly aware of this, Grashorn attempts to recharacterize the material factual issues in this case (and the fact that a reasonable jury could find Herkimer's seizure unreasonable based on them) as an issue of law. He also once more presses the not-very-serious claim that the law regarding police shooting pet dogs is in this Circuit is not yet clearly established.[7] Op. Br. At 18.

_____

[7] If this were true, the Tenth Circuit would be the sole remaining Circuit where that was the case, *see, e.g., Maldonado v. Fontanes*, 568 F.3d 263, 270 (1st Cir. 2009) ("An individual's interest in his pet cat or dog does fall within the Fourth Amendment's prohibition of unreasonable seizures,"); *Brown v. Muhlenberg Tp.*, 269 F.3d 205, 210 (3rd Cir. 2001) ("Accordingly, we join two of our sister courts of appeals in holding that the killing of a person's dog by a law enforcement officer constitutes a seizure under the Fourth Amendment."); *Altman v. City of High Point, N.C.*, 330 F.3d 194, 203 (4th Cir. 2003) ("we hold that the plaintiff's privately owned dogs were "effects" subject to the protections of the Fourth Amendment."), and then the weight of it being so clearly established in all the other Circuits would then still require that it be considered clearly established here. *See Irizarry v. Yehia*, 38 F.4th 1282, 1293 (10th Cir. 2022) ("Thus, even without Supreme Court or Tenth Circuit

As explained below at *infra* § VII(B), the District Court denied Grashorn's

Motion for Summary Judgment because it determined a reasonable jury could find

Grashorn's seizure and summary destruction of Plaintiffs' pet dog to have been

unreasonable. The District Court well articulated the ways the disputed facts could

be resolved in Plaintiffs' favor for a jury to do so, at times even utilizing the various

nonexhaustive *Branson* factors[8] related to reasonableness to illustrate. Appx. Vol.

VI, at 1064-66. The result was a ruling that is not reviewable on interlocutory appeal.

### B. The law was clearly established: Citizens' pets are subject to Fourth Amendment protection, and an officer's warrantless killing (seizure) of them must be reasonable.

The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

---

precedent, persuasive authority from other circuits may clearly establish the law in this Circuit when that authority would have put a reasonable officer on notice that his or her conduct was unconstitutional."). Of course, it is not true. As in every other Circuit, so too is the law on this clearly established in the Tenth. *Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016) ("killing a dog meaningfully and permanently interferes with the owner's possessory interest. It therefore constitutes a violation of the owner's Fourth Amendment rights absent a warrant or some exception to the warrant requirement.").

[8] Factors to assess the reasonableness of the officer's conduct in shooting and killing a pet dog include (1) whether the dog was "at-large" or whether the owner was available and willing to assert control over the dog; (2) the breed of the dog; (3) whether there was time to find an alternative solution to gain control; (4) whether non-lethal means were available to control the dog; (5) whether the dog posed a danger to the officer or the public. *Branson v. Price*, 2015 WL 5562174, at *5 (D. Colo. Sept 21, 2015).

U.S. Const. amend. IV. The Tenth Circuit held in *Mayfield v. Bethards*, 826 F.3d 1252, 1258-59 (10th Cir. 2016) that an officer shooting a citizen's pet dog is a seizure under the Fourth Amendment:

> "We therefore hold that when Deputy Bethards seized the Mayfields' personal property by killing their pet dog Majka in 2014, it was clear his actions would violate the Fourth Amendment absent a warrant "particularly describing the things to be seized," U.S. Const. amend. IV, or circumstances justifying an exception to the warrant requirement…Accordingly, the Complaint plausibly states a claim that survives a qualified immunity defense."

*Id.* As such, Officer Grashorn was long on notice that any warrantless execution he undertook of a citizen's pet dog would need to be reasonable to be lawful. The District Court correctly cited this law. That is the end of this review.

Defendant Grashorn insists across many pages for the third time that Plaintiffs must find a dog shooting case dealing with the "exact" or a "more similar" factual scenario to that present here in order for the law to be clearly established. This is not a good faith exercise. "The question is not whether there is a prior case with precisely the same facts, but 'whether the law put officials on fair notice that the described conduct was unconstitutional.' And we have cautioned that defining a right too narrowly risks making recovery against a public official virtually impossible. *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (citations omitted). And here, where Grashorn killed a friendly dog that had shown no signs of aggression,

that axiom could not be more true. Not only will it be impossible to find such a prior case,[9] but if qualified immunity were permitted to bar recovery on these facts *as a matter of law*, there could not logically be any Fourth Amendment protection extended to pet dogs that remained.

### C. It is not reasonable as a matter of law for an officer to immediately kill any unleashed friendly dog he encounters so that he may eliminate all risk of a dog bite.

The District Court correctly recognized that "whether the dog posed a danger to the officer or the public" is the most critical factor for assessing the reasonableness of a dog shooting using the non-exhaustive list supplied in *Branson*. Indeed, much of the language in Branson speaks directly to this factor alone. Id. at *6 ("[C]learly established law h[olds] that it is unreasonable for law enforcement to kill a pet dog when the dog did not present an imminent threat to law enforcement or the public."). This is because the vast majority of pet dogs are not aggressive, pet dogs can unexpectedly become unsecured all the time, and most of our modern society does not consider an officer justified in shooting a dog merely because it is happened upon

---

[9] *Estate of Smart v. Cty. of Wichita*, No. 14-2111-JPO, 2018 WL 3744063, at *18 n.174 (D. Kan. Aug. 7, 2018) ("[T]he court is troubled by the continued march toward fully insulating police officers from trial – and thereby denying any relief to victims of excessive force – in contradiction to the plain language of the Fourth Amendment."); *Manzanares v. Roosevelt Cnty. Adult Det. Ctr.*, 331 F.Supp. 3d 1260, 1293-94 & n.10 (D.N.M. 2018) ("Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.").

while momentarily unsecured. The killing must be necessary. *See, e.g. Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) ("[I]t was clearly established in 1998 that an officer cannot kill a person's pet unnecessarily."); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001) ("[T]he state may not, consistent with the Fourth Amendment, destroy a pet who posed no imminent danger and whose owners were known, available, and desirous of assuming custody."); *San Jose Charter of Hells Angels v. City of San Jose*, 402 F.3d 962, 977-78 (9th Cir. 2005) ("These cases should have alerted any reasonable officer that the Fourth Amendment forbids the killing of a person's dog, or the destruction of a person's property when that destruction is unnecessary – i.e., when less intrusive, or less destructive, alternatives exist."); *Andrews v. City of West Branch*, 454 F.3d 914, 918 (8th Cir. 2006) (holding officer not entitled to qualified immunity when he shot a pet dog who posed no imminent danger, and who was not "growling, acting fiercely, or harassing anyone at the time [the officer] killed him."). Grashorn's own testimony admitting that Herkimer had demonstrated no aggressive traits or behaviors at the time he killed him proves that his killing was objectively unnecessary. An objectively unnecessary killing of a citizen's pet dog by definition cannot be reasonable, and thus most certainly cannot be deemed reasonable as a matter of law.

Seemingly aware of the jurisdictional constraints limiting this Court's appellate review, Grashorn ham-handedly endeavors to reframe every factual element of this

case as being controlled by the "undisputed fact" that Grashorn "only ha[d] 3 seconds to determine what to do." Op. Br. at 20. But that is *not* an undisputed fact. Plaintiffs have presented ample evidence from which a reasonable jury could find that Grashorn didn't have to *do* anything when Herkimer approached him. The undisputed evidence in this case is that Herkimer was a friendly dog behaving like a friendly dog. The undisputed evidence in this case is that any reasonable officer would have had no difficulty perceiving Herkimer to be a friendly dog immediately. We cannot lose sight of this. There are no facts in evidence supporting the idea that if he had had more time to assess, Grashorn would have been able to recognize that Herkimer was friendly and not killed him. To the contrary, according to Grashorn, because a friendly dog can bite, he can reasonably kill all unleashed friendly dogs.

This bears reiteration: **Grashorn's contention has always been that it is** *per se* **reasonable for him to execute any unleashed dog that approaches him, no matter how friendly appearing, in order to ensure he never gets bitten**. *See, e.g.*, Aplt. Appx. Vol. VI at 1051, No. 132 (where Grashorn wrote in his Statement of Undisputed Material Facts supporting his Motion for Summary Judgment that "it is undisputed that Officer Grashorn was not going to risk Herkimer biting Officer Grashorn's leg."); Id. at 1047, No. 124 (where Grashorn wrote in his Statement of Undisputed Material Facts that "some dogs look friendly but may still attack you"); Id. at 1045, No. 119 (Grashorn stated he had "no way of knowing" whether a dog is

friendly and that, in any event, he wasn't going to "wait to find out"); Id. at 1046, No. 121 (when asked why he didn't utilize a non-lethal alternative to killing Herkimer, Grashorn did not claim there was no time for one, he stated that he "don't take the chances" with non-lethal alternatives because "they don't always work"); Aplt. App. Vol. II, p. 426 (Grashorn Deposition, p. 110-11) (where Grashorn testified that he could not retreat to his vehicle because it would "jeopardize [his] investigation" into "what crime, if any crime, was being committed" and opining that if he "just retreated," he "wouldn't solve any kind of incident" and it "would give people opportunity to get away with stuff").

The fact of Herkimer's breed appearing to be "a pitbull mix" is an immaterial one. First, it cannot be reasonable as a matter of law for a police officer to euthanize any unsecured dog that he encounters merely because it appears to be a pitbull mix. Second, it is obvious from the evidence and the pleadings here that the fact of Herkimer possibly being a pitbull-type of breed was hardly a prequalifying condition to being shot, as the only reason Grashorn's gun was even out and available to execute the friendly-appearing Herkimer is because Grashorn pulled it out in order to kill the also friendly-appearing Bubba (who was definitely *not* a pitbull mix) first. Grashorn clearly does not discriminate based on breed, and the District Court properly found that this factor would not carry the day in any reasonable jury's reasonableness assessment either.

In the end, there was never a "split-second decision" Grashorn had to make about *anything* in this case. There was zero exigency. This was a petty trespass call in a suburban neighborhood in the middle of the day. Grashorn did not wait for cover even though it was only two minutes away. He saw Bubba laying on the pavement unsecured, Plaintiffs were there, willing and able to take control of the dog, and yet he chose to try and quietly sneak up on them all anyway. When Plaintiffs saw Grashorn, they made no furtive gestures and no attempt to flee. When their dogs went to greet Grashorn, they called them back. When Herkimer popped out of the truck, he objectively appeared to be a friendly and curious dog exhibiting not one indicator of aggression. Not only would a reasonable officer have not attempted such a reckless, unreasonable, and foolish approach, but a reasonable officer also would not have perceived any of the subsequent events in this sequence as calling for the summary execution of one or both of Plaintiffs' pet dogs. *See Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) ("The reasonableness of [an officer's] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [the officer's] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.").

Grashorn's final argument, claiming good faith mistake, is a dishonest one. Op. Br. at 40-41 ("Although no one can know whether Herkimer would have bitten Appellant, Appellant is allowed to protect himself against imminent danger even if

his perception may have been incorrect."). Because Grashorn has never claimed that he perceived an imminent threat of an aggressive dog. Grashorn has always agreed that all behavioral indications were that Herkimer was a friendly dog. He skirts around these realities in the pleadings, endeavoring to frame the issue as one of time or mistake. But it is not an issue of time or mistake. Grashorn's contention on scene, throughout this lawsuit, and now in this appeal has always been, at its core, that because friendly dogs can bite, it is reasonable for him to kill any unsecured friendly dog he might encounter in order to completely eliminate the risk of being bitten. Grashorn does not want forgiveness for making a *mistake*. Grashorn wants this Court to grant him and all the rest of law enforcement *permission*. Permission for officers to kill any unsecured dog encountered, no matter the circumstances, no matter the need, no matter the breed, no matter how friendly appearing. Under the guise of seeking qualified immunity, Grashorn asks this Court to enact a *per se* rule authorizing in police dog seizures precisely what the Fourth Amendment expressly prohibits: unreasonableness.

## VII. CONCLUSION

For the aforementioned reasons, the appeal should be dismissed for want of jurisdiction. To the extent that the District Court made any abstract rulings of law reviewable on interlocutory appeal, they were correct, and should be affirmed.

# VIII. ORAL ARGUMENT IS NOT REQUESTED

Oral argument is not necessary. The sole dispositive legal issue of which this Court could have interlocutory appellate jurisdiction (whether police killing a pet dog is a 4th Amendment seizure was clearly established law) was years ago in this Circuit already authoritatively decided. The other argument advanced on appeal by Officer Grashorn (that it is reasonable as a matter of law for an officer to immediately execute any unleashed friendly dog he encounters because all dogs, including friendly ones, are capable of biting) is both dangerous and absurd. The appeal is frivolous. To any extent it is not, the facts and legal arguments are adequately presented in the briefs and the record. Fed. R. App. P. 34(a)(2).

Respectfully submitted this 14th day of June, 2024.

*s/ Sarah Schielke*
Sarah Schielke
The Life & Liberty Law Office LLC
1055 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
E: sarah@lifeandlibertylaw.com
*Counsel for Plaintiffs*

*s/ Madison Waldrep*
Madison Waldrep
The Life & Liberty Law Office LLC
1055 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
E: madison@lifeandlibertylaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type volume limitations of Fed. R. App. P. 37(a)(7)(B) because this brief contains 7,308 words, including footnotes, as determined by Microsoft Word's word count feature.

2. This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman.

Date: June 14, 2024

*/s/ Sarah Schielke*
Sarah Schielke
The Life & Liberty Law Office
1055 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
E: sarah@lifeandlibertylaw.com
*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on June 14, 2024, a true and accurate copy of the foregoing *Plaintiff-Appellees' Response Brief* has been electronically filed using the CM/ECF system which will send notification of such filing to the following parties:

Jonathan Abramson
Yulia Nikolaevskaya
3900 E. Mexico Avenue, Suite 700
Denver, CO 80210
jabramson@sgrllc.com
jnikolaevskaya@sgrllc.com
*Attorneys for Defendant-Appellant Matthew Grashorn*


*/s/ Sarah Schielke*
Sarah Schielke
The Life & Liberty Law Office LLC
1055 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
E: sarah@lifeandlibertylaw.com
*Counsel for Plaintiff*